**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JADA WALKER, Individually and as** | ) | CASE NO.: |
| **Administratrix of the Estate of** | ) | |
| **JAYLAND WALKER, Deceased** | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE: |
| | ) | |
| v. | ) | |
| | ) | |
| **CITY OF AKRON, OHIO** | ) | |
| C/O | ) | |
| Akron Law Director | ) | **COMPLAINT** |
| 161 S. High Street, Suite 202 | ) | |
| Akron, Ohio 44308 | ) | **(Jury Demand Endorsed Hereon)** |
| | ) | |
| and | ) | |
| | ) | |
| **MAYOR DANIEL HORRIGAN** | ) | |
| C/O | ) | |
| Akron Law Director | ) | |
| 161 S. High Street, Suite 202 | ) | |
| Akron, Ohio 44308 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **CHIEF STEPHEN L. MYLETT** | ) | |
| C/O | ) | |
| Akron Law Director | ) | |
| 161 S. High Street, Suite 202 | ) | |
| Akron, Ohio 44308 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **LIEUTENANT DANIEL MARX** | ) | |
| C/O | ) | |
| Akron Law Director | ) | |
| 161 S. High Street, Suite 202 | ) | |
| Akron, Ohio 44308 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **SERGEANT MICHAEL** | ) | |
| **PASTERNAK** | ) | |

1

C/O                                          )
Akron Law Director                           )
161 S. High Street, Suite 202                )
Akron, Ohio 44308                            )
                                             )
and                                          )
                                             )
**SERGEANT VINCENT TERSIGNI**                )
C/O                                          )
Akron Law Director                           )
161 S. High Street, Suite 202                )
Akron, Ohio 44308                            )
                                             )
and                                          )
                                             )
**DETECTIVE SERGEANT**                       )
**MICHAEL ORRAND**                           )
C/O                                          )
Akron Law Director                           )
161 S. High Street, Suite 202                )
Akron, Ohio 44308                            )
                                             )
and                                          )
                                             )
**SERGEANT TODD SINSLEY**                    )
C/O                                          )
Akron Law Director                           )
161 S. High Street, Suite 202                )
Akron, Ohio 44308                            )
                                             )
and                                          )
                                             )
**OFFICER-SHOOTER NO. 1**                    )
C/O                                          )
Akron Law Director                           )
161 S. High Street, Suite 202                )
Akron, Ohio 44308                            )
                                             )
and                                          )
                                             )
**OFFICER-SHOOTER NO. 2**                    )
C/O                                          )
Akron Law Director                           )
161 S. High Street, Suite 202                )
Akron, Ohio 44308                            )
                                             )

2

and                                         )
                                            )
**OFFICER-SHOOTER NO. 3**                   )
C/O                                         )
Akron Law Director                          )
161 S. High Street, Suite 202               )
Akron, Ohio 44308                           )
                                            )
and                                         )
                                            )
**OFFICER-SHOOTER NO. 4**                   )
C/O                                         )
Akron Law Director                          )
161 S. High Street, Suite 202               )
Akron, Ohio 44308                           )
                                            )
and                                         )
                                            )
**OFFICER-SHOOTER NO. 5**                   )
C/O                                         )
Akron Law Director                          )
161 S. High Street, Suite 202               )
Akron, Ohio 44308                           )
                                            )
and                                         )
                                            )
**OFFICER-SHOOTER NO. 6**                   )
C/O                                         )
Akron Law Director                          )
161 S. High Street, Suite 202               )
Akron, Ohio 44308                           )
and                                         )
                                            )
**OFFICER-SHOOTER NO. 7**                   )
C/O                                         )
Akron Law Director                          )
161 S. High Street, Suite 202               )
Akron, Ohio 44308                           )
                                            )
and                                         )
                                            )
**OFFICER-SHOOTER NO. 8**                   )
C/O                                         )
Akron Law Director                          )
161 S. High Street, Suite 202               )
Akron, Ohio 44308                           )

|  | ) |
| --- | --- |
| and | ) |
|  | ) |
| **JOHN DOES NOS. 1-10** | ) |
| C/O | ) |
| Akron Law Director | ) |
| 161 S. High Street, Suite 202 | ) |
| Akron, Ohio 44308 | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Plaintiff Jada Walker, individually and as Administratrix of the Estate of Jayland Walker ("Jayland"), Deceased ("Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendants City of Akron, Ohio, Mayor Daniel Horrigan, Chief Stephen L. Mylett, Lieutenant Daniel Marx, Sergeant Michael Pasternak, Sergeant Vincent Tersigni, Sergeant Michael Orrand, Sergeant Todd Sinsley, Officer-Shooters Nos. 1-8, and John Does Nos. 1-10 (collectively, "Defendants"), and makes the following allegations upon personal knowledge as to Plaintiff's own acts, upon information and belief, and Plaintiff's attorneys' investigation as to all other matters, and states as follows:

## I.    INTRODUCTION

1.    This action arises out of the tragic and senseless shooting death of Jayland Walker, an unarmed Black man, who was inexplicably shot at over 90 times, and struck with at least 45 bullets, by officers of the Akron Police Department after an unnecessary police pursuit that resulted from a cracked taillight and inoperable license plate light.

2.    Plaintiff alleges, without limitation, that Defendants Officer-Shooters Nos. 1-8 ("Defendant Shooters") used excessive force when they fatally shot Jayland Walker without justification on June 27, 2022, in Akron, Ohio.

3. Plaintiff further alleges, without limitation, that Defendants Mayor Daniel Horrigan, Chief Stephen L. Mylett, Lieutenant Daniel Marx, Sergeant Michael Pasternak, Sergeant Vincent Tersigni, Sergeant Michael Orrand, and Sergeant Todd Sinsley knew or reasonably should have known of, participated in, endorsed, condoned, and/or ratified the unconstitutional conduct of their subordinates, the Defendant Shooters.

4. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for the deprivation of the decedent, Jayland Walker's, clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

5. Plaintiff also brings this action pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny.

## II. JURISDICTION AND VENUE

6. This Court has federal question subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is brought, pursuant to 42 U.S.C. § 1983, to redress a deprivation of constitutional rights as set forth herein.

7. Venue is proper in this Court under 28 U.S.C. § 1391 because all incidents, events, and occurrences giving rise to this action occurred in the United States District Court for the Northern District of Ohio and, upon information and belief, all parties reside in this judicial district.

## III. PARTIES

### A. Plaintiff

8. At all times relevant to this action, Plaintiff is/was a resident of the City of Akron, Stark County, Ohio.

9. Plaintiff was appointed by the Summit County Probate Court as the Administratrix for the Estate of Decedent Jayland Walker on November 3, 2022.

5

**B.  Defendants**

### *Officer-Shooters Nos. 1-8*

10.     At all times relevant to this action, the Defendant Shooters Nos. 1-8 are employed as police officers for Defendant City of Akron, Ohio, and are residents of Summit, Portage, and/or Trumbull County, Ohio.

11.     Out of an abundance of caution, the Defendant Shooters are identified using pseudonyms due to the high-profile nature of this matter.

### *Supervisory Officers*

12.     Defendant Sergeant Michael Pasternak ("Defendant Sgt. Pasternak") is a police officer employed by Defendant City of Akron.  At the time of Jayland Walker's killing, he was a direct supervisor of at least one of the Defendant Shooters.

13.     Defendant Sergeant Vincent Tersigni ("Defendant Sgt. Tersigni") is a police officer employed by Defendant City of Akron.  At the time of Jayland Walker's killing, he was a direct supervisor of at least one of the Defendant Shooters and at least one of the officers who pursued the decedent, Jayland Walker, in Akron Police car "24" on the night he was killed.

14.     Defendant Detective Sergeant Michael Orrand ("Defendant Sgt. Orrand") is a police officer employed by Defendant City of Akron, Ohio. Prior to the arrival of investigators from BCI, Defendant Sgt. Orrand was the detective assigned to investigate the scene of Jayland Walker's killing.

15.     Defendant Sergeant Todd Sinsley ("Defendant Sgt. Sinsley") is a police officer employed by Defendant City of Akron, Ohio. Immediately preceding the shooting of Jayland Walker, Defendant Sgt. Sinsley blocked traffic with his police vehicle.

16.     Defendant Lieutenant Daniel Marx ("Defendant Lt. Marx") is a police officer

employed by Defendant City of Akron, Ohio. At the time of Jayland Walker's killing, he was a direct supervisor of Defendants Pasternak, Tersigni, Orrand, and Sinsley.

### Chief of Police

17.     Defendant Stephen L. Mylett ("Defendant Chief Mylett"), at all times relevant herein, is Chief of Police for the Defendant City of Akron.

18.     Per Section 68 of the Charter of the City of Akron, Defendant Chief Mylett is in immediate charge of the Division of Police, has jurisdiction over the Police Station and any substation which may be established, and has control over the stationing and transfer of all patrolmen and other employees constituting the Division of Police, under such rules and regulations as the Mayor may prescribe.

### Mayor

19.     Defendant Daniel Horrigan ("Defendant Mayor Horrigan"), at all times relevant herein, is Mayor of the City of Akron.

20.     Per Section 54 of the Charter of the City of Akron, the duties of Defendant Mayor Horrigan include, but are not limited to:

    a.  Seeing that the laws and ordinances of the City of Akron are enforced;

    b.  Appointing and removing all employees in both the classified and unclassified service, except elected officials;

    c.  Exercising control over all departments and divisions created by the Charter of the City of Akron or that may be created by Council; and

    d.  Having the right to introduce ordinances and take part in the discussion of all matters coming before the City of Akron Council.

21.     Pursuant to Section 58 of the Charter of the City of Akron, the duties of Defendant

Mayor Horrigan include, but are not limited to, causing the affairs of any department or the conduct of any officer or employee to be examined.

22.    Pursuant to section 68 of the Charter of the City of Akron, Defendant Mayor Horrigan is responsible for making all rules necessary for the regulation of the Department of Public Safety, which includes the Division of Police.

23.    Pursuant to Section 67 of the Charter of the City of Akron, Defendant Mayor Horrigan is responsible for making all rules necessary for the discipline of all employees within the Department of Public Safety, which includes police officers within the Division of Police.

### *The City of Akron*

24.    Defendant City of Akron, Ohio ("Defendant City") is a municipal corporation located in Summit County, state of Ohio.

25.    Defendant City is located at Municipal Building 166 South High Street, Suite 103, Akron, Ohio 44308.

26.    At all times relevant to this action Defendant City employed all Defendants and all Akron police officers identified herein.

27.    The City of Akron's Police Department's mission statement is as follows: "Our Mission is to serve the community of Akron in a collaborative effort to enhance the quality of life through crime prevention, enforcement of laws, promotion of safety and reduction of fear."

28.    According to its website, Defendant City of Akron's Police Department also makes five promises to the community of Akron, including:

    a.    "Honesty and Integrity.  We will model a high standard of honesty and integrity in our personal and professional lives."

    b.    "Fairness. We will ensure fair and impartial treatment of all individuals in the

department and the community we serve."

c.  "Competence. Through continuous improvement, we will set a standard of excellence for delivery of law enforcement services in our community."

d.  "Trust. We will enhance trust, teamwork, and communication by cooperating with each other and the community."

e.  "Respect. We will treat everyone with dignity and respect and protect the constitutional right of all citizens."

29.  At all times relevant hereto, Defendants violated its mission statement and the five promises they made to the community of Akron.

30.  Redress is being sought from all Defendants in their official and individual capacities, and all Defendants were acting under and/or outside of color of law and/or pursuant to the policies, customs, and/or usages of the City of Akron.

31.  At all times relevant herein, Defendant(s) John Doe Nos. 1-10, whose names and addresses are unknown despite the exercise of reasonable diligence, are believed to be police officers, supervisors, commanders, and/or other administrative, police department, or City employees of Defendant City of Akron whose identities or involvement in the events giving rise to the claims asserted herein cannot be ascertained and/or discovered by Plaintiff at the present time, but whom, through conducting discovery, may become known as being persons properly included as Defendants in this matter.

32.  At all times relevant hereto, Defendant Mayor Horrigan, Defendant Chief Mylett, Defendant Lt. Marx, Defendant Sgt. Pasternak, Defendant Sgt. Tersigni, Defendant Sgt. Orrand, Defendant Sgt. Sinsley, and Defendants John Does Nos. 1-10 shall be referred to, from time to time, as the "Supervisory Defendants," as set forth below.

## IV.    STATEMENT OF FACTS

33.    All preceding paragraphs are incorporated as if fully re-written herein.

34.    The misconduct of Defendant Shooters and the Supervisory Defendants occurred on or about June 27, 2022.

35.    The misconduct of Defendant City of Akron has been systemic and on-going for many years prior to and through June 27, 2022.

36.    On June 27, 2022, Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2—employees of the City of Akron Police Department—are in patrol car 24 on North Howard Street in Akron, Ohio, when they see a 2005 Buick Century ("Buick") being driven northbound.

37.    The Buick has a taillight with a crack in it and/or an inoperable license plate bulb.

38.    Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 do not observe anything else unusual about the vehicle or its driver.

39.    Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 begin following the Buick on North Howard Street.

40.    The Buick turns right, heading eastbound on East Tallmadge Avenue from North Howard Street.

41.    While following the Buick, Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 run the Buick's license plate through Law Enforcement Automated Data System ("L.E.A.D.S.").

42.    Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 find that the Buick had been driven by a white male the night before when another police department had attempted to stop the vehicle.

43.    Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 find no

warrants for the vehicle or its owner.

44.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 find that the owner of the vehicle, Jayland Walker, is a Black male with a valid driver's license.

45.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 follow the Buick to State Route 8.

46.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 decide to stop following the Buick as it enters onto Route 8 southbound from the East Tallmadge Avenue entrance ramp.

47.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 do not stop the Buick for a cracked taillight and/or inoperable license plate bulb.

48.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 drive back to the intersection of East Tallmadge Avenue and North Howard Street.

49.     A short while later, the officers are in the center left-hand turn lane of North Howard Street, waiting to turn left on East Tallmadge Avenue when they see the Buick again.

50.     At East Tallmadge Avenue, they see the Buick pull up to a stop light, activate its right turn signal, and turn right on East Tallmadge Avenue.

51.     At that point, Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 notice Jayland Walker, a Black male, operating the Buick.

52.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2, however, now conclude that the lawful act of Jayland returning to an intersection is grounds for them to pull him over.

53.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 leave the center turn lane on North Howard Street and begin following Jayland eastbound on East Tallmadge

11

Avenue.

54.     At or near the intersection of Thayer Street and East Tallmadge Avenue, Defendant Officer-Shooter No. 1 activates patrol car 24's overhead lights.

55.     Defendant Officer-Shooter No. 1 "chirps" the patrol car siren to make sure he has Jayland's attention.

56.     Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 continue following Jayland eastbound on Tallmadge Avenue at a speed of approximately 30 miles per hour.

57.     The officers follow Jayland as he again approaches the southbound entrance ramp to Route 8, signals right, and enters the on-ramp.

58.     After Defendant Sergeant Tersigni directs Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 to activate sirens if engaging in a chase, Defendant Officer-Shooter No. 1 activates car 24's sirens and begins to chase the Buick.

59.     While on the southbound entrance ramp to Ohio Route 8, behind the Buick, Defendant Officer-Shooter No. 1 radios "21, shots fired, that vehicle had a shot come out its door."

60.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 see any threatening gesture, alleged gunshot, or other conduct directed at them.

61.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 state that the windows were down.

62.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 state that any hand, arm, object, or weapon is brandished outside of the vehicle.

63.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 see a gun pointed in their direction from any side or rear window of the vehicle.

64.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No.

12

2 see a muzzle flash in their direction.

65.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 see a hand holding a gun.

66.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 see smoke from a gunshot.

67.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 announce the sight of a flash of a gunshot.

68.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 announce any additional threatening gestures or words by the driver of the Buick.

69.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 announce any erratic driving while they are on the on-ramp to Route 8.

70.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 receive information that the driver of the Buick engaged in violent behavior at any point during the previous daylight hours or during the night.

71.     At no point do Defendant Officer-Shooter No. 1 and Defendant Officer-Shooter No. 2 see the Buick being used as a weapon toward any person.

72.     Still, Defendant Officer-Shooter No. 2 radios "Signal 21" which is an Akron Police Department radio call indicating "officer needs help."

73.     At the point Defendant Officer-Shooter No. 2 radios "Signal 21," he knows that this signal is designed to have every officer on duty leave their assigned sector to get involved in the pursuit of Jayland.

74.     According to Defendant Officer-Shooter No. 1's body camera videorecording, officers pursue the Buick for six minutes following the "Signal 21."

75.     During the first three minutes of their pursuit, Akron Police Department officers continue to pursue Jayland, as he never puts another pedestrian or car in eminent threat of harm.

76.     There are no pedestrians outside during the pursuit.

77.     The officers note the traffic is light.

78.     At the end of three minutes, Car 20, operated by Defendant Officer-Shooter No. 3 and Defendant Officer-Shooter No. 4, joins the pursuit of Jayland as the lead pursuit vehicle.

79.     Car 20 and Car 24 follow Jayland for an additional three minutes.

80.     During the final three minutes of the officers' pursuit, they note that Jayland's vehicle is traveling at a rate of 72 miles per hour in light traffic on the freeway.

81.     The officers note the speed of Jayland's vehicle is 35 miles per hour as he exits the freeway.

82.     Continuing southbound on Oakwood Avenue, the officers note the speed of Jayland's vehicle as 15 miles per hour.

83.     The officers call out the speed and direction of Jayland's vehicle as he makes what will be his last turn, 25 miles per hour westbound on Wilbeth Road, in Akron.

84.     At no point do the officers in Car 20 or Car 24 confront any life-threatening gestures or action towards them or any citizen for the final six minutes of their pursuit of Jayland.

85.     In fact, the pursuit continues without threats of any kind from the Buick.

86.     At the end of six minutes of pursuit, the Buick slows down as it approaches the parking lot of a large office building, the Bridgestone Center for Research and Technology, located at 1659 South Main Street, in Akron.

87.     Contrary to the express language of their own departmental policy, Akron police officers use their cars to completely block the street ahead.

14

88.     The officers will later tell investigators that they had Jayland "boxed-in."

89.     But the actions of Defendants in pursuing and blocking off the street decreases the amount of time the officers have to assess their own safety, the safety of Jayland, and the safety concerns of the general public.

90.     The actions of Defendants in pursuing and blocking off the street turns the scene into a violent and eminently lethal setting.

91.     The actions of the Defendants in pursuing and blocking off the street are the product of a conscious choice to ignore any opportunity to re-assess the situation and de-escalate.

92.     In this officer-induced environment of violence and chaos, Jayland opens his driver's side door and puts two feet on the pavement.

93.     An Akron police officer sees Jayland's feet on the ground and—in violation of the City of Akron's Vehicle Pursuit Procedure, P-2020-017—decides to use his car as a battering ram to smash the driver's side door into Jayland's legs, when there is no threat of serious injury or death toward the officer.

94.     When the officer rams the driver side door of the Buick, Jayland falls back into the passenger side of the Buick.

95.     The car rolls slowly over the curb toward the parking lot.

96.     With officers drawing their guns and converging on him, Jayland leaves the Buick from the passenger side door.

97.     All officers have a clear line of sight of Jayland as he leaves his car.

98.     With the illumination of the parking lights and streetlights, all the officers have a clear picture that Jayland is unarmed and has nothing in his hands.

99.     Still, multiple officers, approximately 8-10, run to the scene where Jayland's vehicle

has rolled onto the curb.

100.    The officers see Jayland making no threatening gestures as he runs from his car and enters what will become a fatal funnel of unimaginable gunfire.

101.    The officers hear no threats or violent statements from Jayland.

102.    The officers see no shooting stance or threatening postures from Jayland.

103.    The officers continue to race toward Jayland, ignoring every opportunity to re-assess and de-escalate the officer-induced violence.

104.    The officers chase Jayland on foot, as he runs with his back to the gathering crowd of officers.

105.    Two of the eight officers deploy tasers.

106.    The tasers miss, and those same officers reach for their guns.

107.    Jayland, now running for his life, races toward the empty parking lot, occasionally looking back at the eight officers chasing after him.

108.    Suddenly, and without any warning, eight Akron police officers—the Shooter Defendants—open fire, shooting a total of 94 separate rounds at Jayland.

109.    During the barrage, one officer calls "cease fire," after he sees his four rounds are "effective," as he will later say, on Jayland.

110.    In the officer-induced chaos and violence, the seven other officers ignore the "cease fire" call and continue to fire at Jayland.

111.    Jayland's body falls to the ground.

112.    Officers continue to fire as Jayland lays apparently lifeless on the ground.

113.    After being struck with at least 45 bullets by the Defendant Shooters, Jayland dies.

114.    Shortly thereafter, officers handcuff Jayland's dead body.

16

115.    In the end, despite no justification or threat of force from Jayland, the Shooter Defendants fired 94 shots at Jayland, including as follows: (a) Three of the Shooter Defendants fired 18 rounds each, for a total of 54 rounds; (b) One Shooter Defendant fired 16 rounds; (c) One Shooter Defendant fired 11 rounds; (d) One Shooter Defendant fired 6 rounds; (e) One Shooter Defendant fired 4 rounds; and (f) One Shooter Defendant fired 3 rounds.

## CLAIMS ALLEGED

### COUNT I

**(Excessive Force)**

116.    All preceding paragraphs are incorporated as if fully re-written herein.

117.    This claim is brought pursuant to Title 42 U.S.C. § 1983.

118.    Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

119.    The Fourth Amendment to the United States Constitution states, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

120.    For decades, United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of an unarmed, fleeing citizen. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 2 (1985).

121.    While acting under color of state law, the Shooter Defendants deprived Plaintiff of his well-established right to be free from excessive force, per the authority cited herein.

122.     At all times relevant to this action, Plaintiff asserts Decedent had the well-established constitutional right not to be subjected to excessive force while being arrested, even if his arrest could have been otherwise proper.

123.     In other words, on June 27, 2022, the Defendant Shooters were only permitted to use the amount of force necessary under the circumstances to arrest Decedent.

124.     At all times relevant to this matter, the Defendant Shooters were clothed with the authority of the state and misused that authority.

125.     In this case, Plaintiff claims the Defendant Shooters used excessive force when they arrested and/or seized the person of Decedent, to wit:

a.   The Defendant Shooters shot at Decedent, as stated above, and knowing or having reason to know that Decedent was unarmed, never brandished or fired any weapon toward any officer, nor did he act as though he had a weapon when the Defendant Shooters encountered him;

b.   The Defendant Shooters intentionally fired their service weapons at Decedent and killed him with gunfire while Decedent posed no threat of death or serious bodily harm to the Defendant Shooters;

c.   The Defendant Shooters fired at Decedent as he ran away from the officers into an open parking lot - his back to the officers, putting no officer or other person at risk;

d.   The Defendant Shooters fired at Decedent while Decedent was not firing or pointing a weapon or acting as though he had a weapon; and

e.   The taking of Decedent's life was not necessary to stop Decedent's run from the officers through the parking lot.

18

126.     As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to, Decedent, Plaintiff's brother, was shot and killed, her family was destroyed, and she has endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## COUNT II

### (Supervisory Liability)

127.     All preceding paragraphs are incorporated as if fully re-written herein.

128.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

129.     The Supervisory Defendants is/are the direct supervisors of the Defendant Shooters.

130.     The Supervisory Defendants have supervisory authority over the Canton Police Department and/or the Defendant Shooters.

131.     At all times relevant to this action, the Supervisory Defendants knew or reasonably should have known of, and/or participated in, and/or condoned, and/or ratified:

    a.  The Defendant Shooters shooting at Decedent when he posed no risk of lethal harm to any officer or civilian because he was unarmed when he left his vehicle;

    b.  The Defendant Shooters shooting at Decedent when he posed no risk of lethal harm to any officer or civilian and the Defendant Shooters all had a clear line of sight and clear picture that Decedent was unarmed.

    c.  The Defendant Shooters shooting at Decedent when they created a scene, rife with rule-breaking, chaos, and violence, as they ignored their own policies and procedures regarding the blocking of streets and the use of cars as battering rams;

    d.   The Defendant Shooters' failing to de-escalate the scene, thereby making the scene more dangerous to Decedent, the officers, and the general public;

    e.   The Defendant Shooters' tactical decisions against Decedent when he ran from his car;

    f.   The Defendant Shooters' use of lethal force while facing no threat of lethal force as Decedent ran from his car with his empty hands plainly visible; and

    g.   The Defendant Shooters' use of lethal force while facing no threat of lethal force and having little experience while on the job.

132.    The Supervisory Defendants knew or reasonably should have known that their acts and/or failures to act would likely cause the constitutional injury that befell Plaintiff and Decedent, to wit: by endorsing, promoting, encouraging, and/or not disciplining the Defendant Shooters' actions, and/or by keeping them employed at the City, and/or by allowing them to continue to use their firearms as police officers under the circumstances detailed in this Complaint, Decedent was killed and Plaintiff lost her son as a result of the Defendant Shooters' reckless, wanton, and/or willful actions which were endorsed, condoned, and/or ratified by Defendants.

133.    The Supervisory Defendants had a duty and/or were required by his/their training to take action to discipline and/or otherwise prevent the Defendant Shooters and/or the other Defendants from engaging in the above-stated conduct.

134.    Despite his/their knowledge of the Defendant Shooters' misconduct, as stated above, the Supervisory Defendants took no action, failed to impose reasonable discipline, failed to follow chain of command, failed to document the instances of misconduct, and/or otherwise abandoned his/their supervisory duties.

135.    As a result of his/their failures and/or abandonment of his/their supervisory duties, as

stated above, the Supervisory Defendants created an environment that  condoned the aforementioned misconduct and perpetuated and/or facilitated and/or aided the Defendant Shooters in the unreasonably violent and grotesque seizure of Decedent's person and the taking of his life when he posed no lethal threat to Defendants or anyone else at the time he was killed.

136.    The Supervisory Defendants engaged in acts and omissions that were the product of a reckless or callous indifference to Decedent's and Plaintiff's constitutional rights, to wit:

      a.  Defendants trained, endorsed, and/or condoned the Defendant Shooters to shoot at subjects in the manner detailed above, i.e., when the subject had no weapon nor posed any direct threat to them or the life of another;

      b.  The Supervisory Defendants knew or had reason to know that the Defendant Shooters coordinated their stories on or about the night of Decedent's shooting with the assistance and coaching of their police union leadership and the assistance of Defendants to create an artificial narrative of the events of June 27, 2022, all to protect Defendants from civil or criminal liability; and

      c.  Despite having the aforesaid knowledge, Defendants continue to condone the conduct and actions of the Defendant Shooters as stated above.

137.     By their acts and failures to act as stated above, the Supervisory Defendants in fact caused Plaintiff's constitutional deprivation: to wit, Decedent was seized/killed with lethal force while running from them unarmed in violation of the 4th and 14th Amendments to the United States Constitution.

138.    As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to, Decedent, Plaintiff's brother, was shot and killed, her family was destroyed, and she has endured pain, anguish, embarrassment, humiliation, feelings

of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal

safety, dignity, and legal fees and costs.

## COUNT III

### (Municipal Liability pursuant to *Monell*)

139.     All preceding paragraphs are incorporated as if fully re-written herein.

140.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

141.     Defendant Mayor Horrigan and/or Supervisory Defendants is/are the top

policymakers for the City of Akron Police Department.

142.     Defendant City of Akron maintains an armed police force, the Akron Police

Department, with the power to arrest citizens.

143.     Defendant City of Akron is aware that its officers engage in violent behavior that

involves excessive force in violation of the Fourth Amendment which disproportionately involves

African Americans, to wit:

     a.  The excessively forceful and violent and lethal arrest of Jayland Walker on June

        27, 2022, an unarmed black male who was shot by the 8 Defendant-Shooters

        while running away, following a minor traffic violation (unlit license plate and

        cracked taillight) and pursuit;

     b.  The excessively forceful and violent arrest of Charles Hicks II on February 7,

        2021, an unarmed black male who was arrested with an officer's knee near his

        neck while the officer smothered his mouth and nose with snow as he lay on the

        ground following his refusal to leave the porch area of his home;

c. The excessively forceful and violent arrest of Elijah Cade on January 7, 2020, an unarmed black male who was shot by Akron Police officers following a minor traffic violation (no visible license plate) and pursuit;

d. The excessively forceful and violent arrest of Patrick King on October 21, 2018, an unarmed white male who was tased, knocked to the ground, and punched while on his stomach for refusing to identify himself;

e. The excessively forceful and violent arrest of Jamon Pruiett and LaTrent Redrick on October 1, 2017, two Black males with no prior criminal records who were shot by an Akron police officer while standing outside of an downtown area nightclub and making no threat toward any officer;

f. The excessively forceful and violent arrest of Dr. Dale Leonhardt on December 5, 2015, an unarmed white male whose arm was broken by an Akron police officer following a minor traffic violation (failing to come to a full stop prior to turning right at a traffic light);

g. The excessively forceful and violent arrest of Tamika Williams on October 26, 2012, an unarmed Black 13-year-old girl whose arm was broken by an Akron school resource officer after he put her arm behind her back, pushed her face-first into lockers, and lifted her off the ground.

144. On or about May 27, 2020, nearly two years before Decedent Walker was killed, Defendant Mayor Horrigan posted on the official Akron Mayor Facebook account: "When black people are disproportionately targeted and killed by police officers, racism is an absolute factor. Historically, Black people have been targets of violence by law enforcement."

145. The post was removed an hour later, after the Akron local police Union objected

saying on its Facebook page, "It is a shame when the Mayor's office promotes a false narrative."

146.     Defendant City of Akron and Defendant Mayor Horrigan have a long-standing and unwritten policy or custom of shielding officers from consequences for their use of excessive force and/or ignoring the use of excessive force on citizens during arrests, to wit:

      a.   The City is known to offer lawsuit waivers in exchange for dropping the charges against individuals who are subjected to excessive force during their arrest;

      b.   The City accepts excessive force as a condition of police work at the City of Akron, to the extent that officers are trained and aided on how to avoid prosecution for their violent actions by re-phrasing and artfully summarizing their violent actions and encounters with citizens in police documentation;

      c.   For years, Defendant Mayor Horrigan has acquiesced to a culture of violence in the Akron Police Department by abandoning his duty under the Charter of the City of Akron to exercise control over the Police Department and by avoiding any study of the number of excessive force cases and violence involved in the arrest of citizens within the City of Akron;

      d.   For years prior to Decedent Walker's death, Defendant Mayor Horrigan has fostered and condoned a culture of violence in the Akron Police Department by abandoning his duty under the Charter of the City of Akron to remove police officers and/or exercise control over the Police Department by allowing city employees to restrict and/or interfere with and/or hamper the oversight activities of the Office of the Police Auditor; and/or

      e.   For years prior to Decedent Walker's death, Defendant Mayor Horrigan has perpetuated a culture of violence in the Akron Police Department by permitting

24

officers who have engaged in excessive force or unreasonable violence toward citizens to avoid the consequences of discipline or criminal investigation by allowing them to simply retire.

147.    The unwritten policy and/or custom stated in the immediately preceding paragraphs is/are known to the Defendant Mayor Horrigan and Supervisory Defendants, who approved, benefitted from, ratified, encouraged, sanctioned, and/or promoted this policy or custom throughout the Akron Police Department.

148.    Following the death of Decedent Walker, the Supervisory Defendants and Defendant Mayor Horrigan continue to approve, ratify, encourage, sanction, and/or promote the policy or custom of ignoring excessive force and fostering a culture of violence as they expressed support for the Defendant Shooters' actions regarding the death of Decedent, imposed no discipline on the Defendant Shooters, and have changed none of the training at Defendant City Akron.

149.    Defendant City of Akron also maintains an unwritten policy or custom of fostering racist and violent ideas and attitudes towards African Americans within the City of Akron, to wit:

a.  Officers currently employed at the City of Akron participated, read, received, circulated, or found humorous a newsletter, titled, "Signal 44 (PBS to Air a New Wildlife Documentary)." Attached as Exhibit 1.

b.  The newsletter contained the following quotes and statements in reference to how citizens within the City of Akron are treated by officers:

i.  It referred to officers as "District 20's resident game wardens."

ii.  It referred to District 20 as a "preserve" from the following portion: "Chasing down a young male of the Snyder area of the preserve where they hoped to catch the young species and tag him so his predatory

activities can be tracked (note to camera man, edit out the rabbit punches)."

iii. "Officer delivers 15 closed fist abdominal thrusts. The officer applies the forearm/bicep torniquet to the victim's neck which proves successful. The young male falls completely unconscious. They work quickly to complete the summons and staple it to the young male's forehead."

iv. "Next the officers respond to a downed female. She appears to be clubbed on the head. As the pair studies the female, they quickly discount the theory that the injury was a result of a mating ritual. Primarily because the injury was caused by a 40oz bottle, which usually denotes hostility, whereas the 22oz longneck bottle usually indicates affection during the courtship process. The bright young officers note that the female is still carrying 76$ [sic] in food stamps, indicating that scavengers roaming the preserve have not yet discovered the easy prey. An 18 year old cub of the downed female, wanders onto the scene and begins screaming hysterically. Ofc. McFarland, a skilled linguist, translates. The female cub states that a lone male that occasionally visits the brood did this. The female cub, states that the violent male did not sire her but she later admits that he is the donor responsible for 2nd sister and 4th brother. In an effort to calm her down, Ofc's Male and McFarland arrest her for her outstanding warrants."

v. "The officers explain that the male species in district 20 are not that different from males in any other part of the city. They too, crave female

companionship. Usually the first of each month (unless that falls on a Sunday, in which case the checks come the next day). They also feel the desire to break away from the family heard occasionally. Usually the second day of each month. At this time they climb into their primitive conveyance. (Usually an Oldsmobile product circa 1977-1985). They then attempt to drown out the whining of their numerous offspring by playing some fucking bass-driven noise at a decibel level so high that it causes the inner-ear to bleed."

vi. Another portion of the newsletter reads: "The man will jump out of the back window, jump a fence into the pen of three Rottweilers … his death will mean he can no longer smoke crack … this in turn means over his lifetime, he will not break off 1109 antennas off of Oldsmobiles."

vii. "Then came the Uzis. This too was bad. The combatants would spray thousands of rounds, missing each other but shooting up a busload of blind, one-legged kids going to Chemotherapy Camp who happened to be driving by. Then came the shotguns. This was good. One combatant would be killed and the other would be arrested and go to jail. Then the male that sold them both their guns would take over."

c. According to the findings of an Internal Affairs inquiry that occurred at the time of the newsletter's discovery in 1998, <u>currently employed veteran police officers</u> (emphasis added) expressed support (or no offense) regarding its contents, to wit:

i. Officer Clay Cozart, currently employed at the City of Akron's Police Department as a detective – while also being the current president of the

Fraternal Order of Police, Lodge #7 – was interviewed and said at the time he was not offended that his name was in the newsletter and added that publicity about the subject was "unfair."

    ii.  Officer Brian Simcox, currently a Lieutenant at the City of Akron's Police Department, said at the time he was not offended that he appeared in the newsletter and thought its contents was "hilarious."

    iii.  Officer Brian Harding, currently a Deputy Chief at the City of Akron's Police Department, said at the time that he was not offended at appearing in the newsletter, felt the newsletter had no adverse effect on the shift, and thought the contents of the newsletter were "funny."

  d.  The officer who authored the content of the aforesaid newsletter, Terry Pasko, remained employed with the City of Akron as a police officer until 2019, when he retired as a Captain.

150.    No officer was fired for their involvement in the Signal 44 newsletter.

151.    None of the officers who expressed being humored by the newsletter were disciplined.

152.    None of the officers who expressed no offense at being named in the newsletter were disciplined.

153.    By virtue of the Internal Affairs investigation and public reporting on the subject at the time, the Defendant City and Defendant Mayor Horrigan have knowledge of the Signal 44 newsletter and its contribution to the culture of violence and racism at the City of Akron's Police Department.

154.    To date, Defendant City has never initiated any meaningful disciplinary proceedings,

policy reviews, or culture reforms since the discovery of the Signal 44 Newsletter as it refers to excessive force against African Americans within the City of Akron Police Department.

155. The aforesaid unwritten policies or customs put Decedent, Plaintiff, and the general public at unreasonable risk of grievous bodily harm, injury, or death.

156. The aforesaid unwritten policies or customs as shown by the pattern of unreasonably violent cases listed above and reinforced by the lack of meaningful discipline following the discovery of the Signal 44 newsletter did in fact cause the death of Decedent.

157. At all times relevant hereto, the Defendant Mayor Horrigan and Supervisory Defendants initiated, authorized, condoned, ratified, and/or encouraged the aforesaid unwritten policies or customs.

158. Defendant Mayor Horrigan and Supervisory Defendants had knowledge of the aforesaid unwritten policies or customs because they worked at the City of Akron at the time the aforesaid policies or customs were in place.

159. The Supervisory Defendants reviewed documents, discussed, and/or received details and information at the Akron Police Department about the manner in which the Defendant Shooters shot and killed Decedent while he was running from them unarmed.

160. By their actions and failures to act as aforesaid, Defendant Mayor Horrigan and the Supervisory Defendants approved of the Defendant Shooters' conduct.

161. Defendant Mayor Horrigan and the Supervisory Defendants were thus on actual and/or constructive notice of these policies or customs but did nothing about them.

162. Upon information and belief, Defendant City of Akron does not train its police force on bias-free policing or law enforcement vehicular pursuits, to wit:

a. In Executive Order 2015-04K, the Governor for the State of Ohio established the Ohio Collaborative Community-Police Advisory Board, to establish trust with citizens and law enforcement and explore and strengthen fractured relationships between the two.

b. The purpose of the Ohio Collaborative Community-Police Advisory Board was to set state-wide minimum standards for State and local law enforcement.

c. The Ohio Collaborative Community-Police Advisory Board encouraged law enforcement agencies to adopt model departmental policies and best practices, but Defendant City of Akron has failed to do so.

d. In fact, Defendant City of Akron is one of the Ohio cities that has never met the criteria for the Ohio Collaborative Law Enforcement Certification regarding bias-free policing.

e. Defendant City of Akron is one of the Ohio cities that has never met the criteria for the Ohio Collaborative Law Enforcement Certification regarding vehicle pursuits.

163. Upon information and belief, Defendant City of Akron does not train officers, such as the Defendant Shooters, to de-escalate or disengage from vehicle pursuits where persons, like Decedent, run from officers on foot while unarmed.

164. Upon information and belief, Defendant City of Akron does not discipline officers, such as Defendant Shooters, who shoot and/or kill persons, like Decedent, who run from officers on foot while unarmed following a vehicle pursuit.

165. Upon information and belief, Defendant City of Akron does not discipline officers, such as the Shooter Defendants, who fail to deescalate situations where persons, like Decedent, run

30

from officers on foot while unarmed following a vehicle pursuit.

166.    The need for said training and discipline, as aforesaid, is so obvious that the failure of Defendants to conduct said training and discipline establishes Defendants' objective deliberate indifference to the constitutional rights of Plaintiff and Decedent and all who live in the City of Akron.

167.    As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to, Decedent, Plaintiff's brother, was shot and killed, her family was destroyed, and she has endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for not less than $45,000,000.00, $1 million for each bullet that struck Jayland Walker, including but not limited to:

A.    Compensatory and consequential damages in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

B.    Punitive damages in an amount to be determined at trial, for the willful, reckless, and malicious conduct of Defendants;

C.    Equitable relief, including, without limitation, that Defendant City of Akron be made to adopt an appropriate policy to prevent future instances of the type of misconduct described herein;

D.    Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

E.    Any and all other relief that this Court deems equitable, just and proper.

## JURY DEMAND

Plaintiff respectfully demand a trial by jury of the within matter.

Respectfully submitted,

*/s/ Robert F. DiCello*
Robert F. DiCello (0072020)
Kenneth P. Abbarno (0059791)
Justin J. Hawal (0092294)
Peter C. Soldato (0099356)
**DICELLO LEVITT LLP**
8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
Tel.:  440-953-8888
rfdicello@dicellolevitt.com
kabbarno@dicellolevitt.com
jhawal@dicellolevitt.com
psoldato@dicellolevitt.com

Elizabeth Paige White*
**DICELLO LEVITT LLP**
1101 17th Street, NW, Suite 1000
Washington, DC 20036
pwhite@dicellolevitt.com

*Counsel for Plaintiff*

*Pro Hac Vice* forthcoming